**HOUSTON LIGHTING & POWER COMPANY, Petitioner,**

**v.**

**TENN–TEX ALLOY & CHEMICAL CORPORATION, Respondent.**

**No. A–10868.**

Supreme Court of Texas.

March 2, 1966.

Rehearing Denied March 30, 1966.

Baker, Botts, Shepherd & Coates, Wm. R. Brown and Alvin Owsley, Jr., Houston, for petitioner.

Butler, Binion, Rice, Cook & Knapp, John L. McConn, Jr., Houston, for respondent.

SMITH, Justice.

Plaintiff Tenn-Tex Alloy & Chemical Corporation, hereinafter referred to as Tenn-Tex, brought this suit against defendant Houston Lighting & Power Company, hereinafter referred to as the electric company, to recover the amount of $26,143.00 in alleged overcharges for electric power furnished by the electric company to Tenn-Tex. The cause was tried before the trial court sitting without a jury, and judgment was rendered in Tenn-Tex's favor for the full amount plus interest. This judgment was affirmed by the Court of Civil Appeals. 390 S.W.2d 328. We reverse the judgments of the trial court and the Court of Civil Appeals and render judgment that Tenn-Tex take nothing by its suit.

The controversy between the parties arises out of conflicting interpretations of a written contract dated August 31, 1956,

under which the electric company agreed to furnish high voltage electricity to Tenn-Tex. Although the electric company has provided Tenn-Tex with power continuously since the date of the contract, and all bills have been paid as rendered, only the amounts of the charges for the months of August and December, 1960, and January, February and March, 1961, are in dispute. The sole question before this court is the proper interpretation of the provisions of this contract prescribing the method for calculating the minimum monthly charge for electric service.

This is a unique case in that neither party cites cases or authorities which analyze a contract similar to the one we have before us, nor have we found any by our independent search. Therefore, since there are no precedents on this precise question, we have been compelled to rely, in the main, on general principles of contract interpretation in reaching our decision.

### General Background

By way of assistance to the Court the electric company, in its brief, discusses some of the underlying principles of supply and demand in the electrical industry. Although this information was not introduced in evidence in the trial court and has no effect on an interpretation of the contract before us, Tenn-Tex does not challenge its accuracy; therefore, since it appears to us that this background information is helpful to an understanding of the contractual relationship created between the parties, we include it herein. The electric company states that due to the fact that electricity cannot be stored, different considerations of supply and demand are involved in its production and sale as distinguished from the production and sale of water or gas. Since an electric company cannot run the generators of its plant at times when there is a relatively small demand from its customers so as to produce and retain a reserve of power which could then be released during a period when demand exceeds the full generating capacity of the

plant, it must take into account the generating capacity each customer requires and then pre-empt and hold available a certain portion of the company's generating capacity so as to provide for that customer's future need. In effect, the customer is renting generating capacity. This *demand factor,* the customer's requirement of generating capacity, is incorporated into the rate charged the customer for the service and is measured in kilovolt amperes (kva). One kva is roughly the equivalent of one horsepower.

Another factor which the electric company must consider in making its charges for service is the extent to which a customer actually makes use of the generating capacity available. If one customer uses the generation for only one hour per day and another uses the generation for twenty-four hours per day, obviously the latter will be and should be charged more. This *usage factor* is also incorporated into the rate and is measured in kilowatt hours (kwh). When the customer receives its electric bill, it is a combination of both the kva and kwh factors.[1]

Thus, it is seen that in the electric business a company must have available at all times sufficient generating capacity to meet the maximum load which may be imposed on its system at any time. Otherwise, if the demand at times of peak load exceeds the available generating capacity, the company would have to terminate service to some customers until the load was reduced to a size commensurate with available generating capacity. This demonstrates the importance of the demand factor (kva) whereby a customer will be charged for that portion of the generating capacity pre-empted by past usage, subject to adjustment as the usage increases or decreases in future months. Therefore, under a provision in the contract, the customer sets its own minimum charge by the maximum load it imposes on the company's system. This maximum load is to be carried forward as a minimum charge for the ensuing eleven months so as to assure to the company a return on the generating capacity pre-empted by the customer's demand. It follows that this minimum charge would serve to deter the customer from imposing an infrequent and extraordinarily high demand on the generating facilities since to do so would raise its minimum monthly charge to a level considerably higher than the charge for the power which would actually be used each month during the next eleven months. This leveling of demand serves to minimize the reserve generating capacity which the company must have available for peak periods and which would be idle much of the time.

The electric company points out that in this area of the country an electric utility experiences its heaviest demand during the summer months because of air conditioning, and the peak load on the system comes during the daylight hours. The contract between the electric company and Tenn-Tex designates all twenty-four hours of the day during the period from October 15 to May 15 and the hours from 10 p. m. to 8 a. m. during the remaining portion of the year as "OFF PEAK" periods. Conversely, any usage of the generating facilities of the company between 8 a. m. and 10 p. m. during the period from May 15 to October 15 is designated as "ON PEAK." The contract contains benefits to the customer which seek to induce use of electricity during the "OFF PEAK" periods, and the purpose of this encouragement is to promote more efficient full-time employment of the company's facilities.

---

1. Residential customers are normally billed only on a usage basis (kwh) because of the complexities of measuring the demand; however, all commercial and industrial rates include a demand factor (kva). As further illustration, defendant draws an analogy between the electric business and an automobile rental business—the customer pays a daily rental for the vehicle itself whether it is actually driven or not (comparable to the kva charge) plus a use or mileage charge (comparable to the kwh charge).

*Pertinent Contractual Provisions*

With this background information in mind, we now turn to a consideration of those portions of the contract which are relevant to the dispute between the parties:

"NET MONTHLY BILL

"D.   The amount of the net monthly bill shall be whichever is higher of the amounts determined under (i) and (ii) below subject in each case to the applicable adjustments stated under (iii) below:

"(i) Rate:

[Not in dispute]

Kva  Charge
$900.00  first 1,000 kva or less
     .80  per kva next 1,000 kva
     .60  per kva all additional kva, plus

Kwh  Charge
5.5 mills per kwh first 200,000 kwh
4.5 mills per kwh next 200 kwh per kva
3.5 mills per kwh next 200 kwh per kva
3.0 mills per kwh all additional kwh

"(ii) Minimum:

[Not in dispute]

The sum of (a) the kva charge applicable to the highest kva established during the 12 months ending with the current month and (b) the kwh charge applicable to 200 kwh for each kva of said highest kva and (c) the adjustments stated below.  In no event shall the sum of (a) and (b) be less than $2,000.00.

"(iii) Adjustments:   [Not in dispute]

---

\*     \*     \*     \*     \*     \*     \*

"KVA USED IN CALCULATING THE NET MONTHLY BILL

"H.  The KVA charge to be used in calculating the net monthly bill shall be determined in accordance with the following provisions:

"(1) If the highest KVA established in any month, whether it is the highest ON PEAK KVA or the highest OFF PEAK KVA, is equal to or less than the highest ON PEAK KVA established in any of the twelve months ending with and including the current month, such highest KVA for the current month shall be deemed to be the KVA for billing purposes.

"(2) If the highest OFF PEAK KVA established in the current month exceeds 100% but not 150% of the highest ON PEAK KVA established in the twelve months ending with and including the current month, the customer shall be billed only for such highest ON PEAK KVA so established during said period.

"(3) Should the highest OFF PEAK KVA established in any month exceed 150% of the highest ON PEAK KVA established in the twelve months ending with and including the current month, then the excess above 150% shall be deemed for billing purposes to have been taken as additional ON PEAK KVA and shall be added to the highest ON PEAK KVA established in said twelve months period, which highest ON PEAK KVA, as increased by such excess, shall be the KVA for billing purposes for the current month. Such KVA so established for billing purposes shall also be deemed, for future billing purposes, as the highest ON PEAK KVA established in such current month."

# 300

The real controversy here is over the amount to which the electric company was entitled under the terms of the contract as the minimum for each of the months in dispute. The parties agree that the minimum monthly charge to which the electric company was entitled for each of the months is fixed by D(i), (ii), and (iii). They agree on the actual usage kva rate to be charged under D(i), and kwh applicable under D(ii) (b), and the adjustments to be made under D(iii). The controversy between the parties involves the meaning of the language, "the kva charge applicable to the highest kva established during the 12 months ending with the current month," in D(ii) (a) of the minimum bill provision. Both parties agree that the contract is unambiguous, that in arriving at the meaning of the quoted language we must consider the contract from its "four corners," Southland Royalty Co. v. Pan American Petroleum Corp., 378 S.W.2d 50, 53 (Tex.1964); Spence & Howe Construction Co. v. Gulf Oil Corp., 365 S.W.2d 631 (Tex. 1963); Ohio Oil Company v. Smith, 365 S.W.2d 621, 627 (Tex.1963); and that eventually we must look to paragraph H to determine the correct charge for the month in question. The following schedule is helpful to a complete understanding of the controversy before us and will be referred to as our discussion of the contractual terms and calculations progresses.

### TENN-TEX ALLOY & CHEMICAL CORPORATION
#### Established Kva Demands

| Year and Month | Established On-Peak Kva | Established Off-Peak Kva |
|---|---|---|
| **1959** Jan. | | 17,190 |
| Feb. | | 17,520 |
| Mar. | | 17,310 |
| Apr. | | 16,800 |
| May | 16,260 | 16,350 |
| June | (3) 16,650 | 16,560 |
| July | 11,370 | 11,370 |
| Aug. | 10,800 | 10,830 |
| Sept. | 10,950 | 10,950 |
| Oct. | 11,040 | 11,280 |
| Nov. | | 11,790 |
| Dec. | | 17,610 |
| **1960** Jan. | | 17,670 |
| Feb. | | 18,870 |
| Mar. | | 19,200 |
| Apr. | | (1) 20,130 |
| May | 12,210 | 19,500 |
| June | (2) 12,540 | 12,480 |
| July | 12,480 | 12,480 |
| *Aug. | 7,080 | 7,080 |
| Sept. | 12,600 | 12,540 |
| Oct. | 12,630 | 12,750 |
| Nov. | | 12,810 |
| *Dec. | | 7,080 |
| **1961** *Jan. | | 480 |
| *Feb. | | 480 |
| *Mar. | | 12,600 |

* Billing months in dispute

(1) "[H]ighest kva established during the 12 months ending with" each month in dispute per the electric company's contention.

(2) "[H]ighest [ON PEAK] kva established during 12 months" ending with August per Ten-Tex's contention.

(3) ON PEAK kva charge applicable to the 20,130 OFF PEAK kva under H (2) per the electric company's contention.

Note: No on peak readings are shown for the months of November through April because in the contract these months are designated as off-peak.

---

Taking the first month in dispute, August, 1960, as illustrative, the schedule shows that the ON PEAK and OFF PEAK kva for that month was 7,080. As said above, both parties agree that first it is necessary to compute the *actual usage* charge and that 7,080 kva would be used for the calculation under D(i); next it is necessary to determine the *minimum* charge, and the calculation under D(ii) is made. Whichever of these two amounts is higher will be charged as the net monthly bill.

### Contentions of the Parties

Tenn-Tex contends that before making any calculations of the minimum under D(ii) we must first analyze paragraph H which designates the kva to be used in calculating the net monthly bill and that when we do we will be forced to conclude that the quoted language really means "the kva charge applicable to the highest [ON PEAK] kva established during the 12 months." Tenn-Tex's construction of paragraph H is that the only kva which is *established* thereunder for the purpose of billing beyond the current month is ON PEAK kva, and, as seen on the schedule, the highest ON PEAK kva for any month during the 12 months ending with August was 12,540 for the month of June, 1960. Therefore, Tenn-Tex argues that its net monthly bill for August would have been calculated and rendered on the 7,080 kva actually used under D(i) and H(1) except that the contract gave the electric company the right to charge a *minimum* bill, as calculated under D(ii) for the month of August based

on the 12,540 ON PEAK kva of June, 1960. By confining itself to ON PEAK readings for each of the months in dispute Tenn-Tex arrives at a lower minimum charge for each month than the electric company did. Tenn-Tex's interpretation of the contract was adopted by the trial court in its findings of fact and conclusions of law.

The electric company agrees that the bill for August, 1960, was calculated at 7,080 kva and would have been rendered for that amount were it not for the higher minimum charge calculated under D(ii). However, in calculating the minimum charge, the electric company contends that the language in clause (a) is not confined to "the highest [ON PEAK] kva established during the 12 months" period but instead necessarily means "the highest kva [whether ON PEAK or OFF PEAK] established during the 12 months" period. The schedule shows that the highest kva for the 12-month period ending with August, 1960, is the OFF PEAK kva of 20,130 for the month of April, 1960. Next, the electric company argues, it is necessary under the contract to find the "kva charge applicable" to this highest kva and, to do this, we must look to paragraph H. Under H (2) it is seen that in April, 1960, the 20,130 kva was more than 100% and less than 150% of the 16,650 ON PEAK kva for June, 1959, which was the highest kva for any month in the 12-month period ending with April. Therefore, under the terms of H(2), the "kva charge applicable" to 20,130 must be computed by using the 16,650 kva figure as the established kva for

the month of April, 1960, and it follows that under the contract the electric company is obligated to use 16,650 when figuring the minimum for August, 1960. We agree with the electric company's interpretation of the meaning and the mechanics of the contract.

### Conclusion

We have given careful consideration to paragraph H in view of Tenn-Tex's contention that the only kva figures established for future billing purposes under its terms are ON PEAK kva. It is sufficient to say that, in extending the possibilities under each of the three sections of the paragraph to their logical conclusion, we have not found our understanding of the ultimate effect of paragraph H to be in harmony with that of Tenn-Tex. Furthermore, we can definitely say that we do not interpret the clause of D(ii) (a) as excluding OFF PEAK kva from consideration when looking for "the highest kva established" during the preceding 12 months, nor do we think such construction defeats the contractual inducements which seek to promote OFF PEAK use of electric power by the customer. There is nothing within the contract itself which would give rise to the implication that the language in D(ii) (a) must be limited to ON PEAK kva so as to give effect to all the provisions of the contract. See Steeger v. Beard Drilling, Inc., 371 S.W.2d 684 (Tex.1963). By its interpretation, the electric company is not using a kva established more than 12 months earlier but instead is merely applying the kva charge designated under the terms of paragraph H as applicable to the actual kva established during April, 1960, in making the monthly charge. Under our interpretation of D(ii) (a) as not excluding OFF PEAK kva, in the absence of the additional step required under H(2) the minimum would be calculated solely on the basis of 20,130 kva, with no adjustment to 16,650 kva, and such calculation would result in a higher minimum charge.

We have determined that Tenn-Tex's contentions cannot be sustained. We therefore reverse the judgments of the trial court and the Court of Civil Appeals and render judgment that Tenn-Tex take nothing by reason of its suit.